PEOPLE v LOUIS WILLIAMS

PEOPLE v SCOTTS

1. WITNESSES—CRIMINAL LAW—IMMUNITY—FAILURE TO OBJECT—IN-
   STRUCTIONS TO JURY—CRIMINAL ACTIVITIES—PREJUDICE—AP-
   PEAL AND ERROR.

   References by the prosecution to the immunity of a witness as to
   crimes in which he and a defendant were involved does not
   constitute reversible error where defense counsel raised no
   objection on the record, the jury was cautioned that they were
   not to consider the crimes for which immunity was given, there
   were no constant references to the crimes, no deliberate and
   repeated efforts to present the jury with facts concerning prior
   criminal activities and no prejudice flowing to the defendant
   from the oblique references to other criminal activities.

2. WITNESSES—CRIMINAL LAW—IMMUNITY—SCOPE OF IMMUNITY—
   JURY—WITNESS CREDIBILITY.

   A defendant may not complain of error because a trial court
   forced a prosecutor to give a witness blanket immunity where
   defense counsel fought strenuously and successfully for the
   immunity, and where the jury was acutely aware of the scope
   of the immunity and able to consider its effect on the credibil-
   ity of the witness.

3. CRIMINAL LAW—DEFENSES—ALIBI—INSTRUCTIONS TO JURY.

   An instruction to the jury that if any reasonable doubt exists as

REFERENCES FOR POINTS IN HEADNOTES

[1] 75 Am Jur 2d, Trial §§ 193, 305.

[2] 21 Am Jur 2d, Criminal Law § 146 *et seq.*

[3] 75 Am Jur 2d, Trial §§ 729, 730.

[4] 81 Am Jur 2d, Witnesses § 457.

Refreshment of recollection by use of memoranda or other writings.
82 ALR2d 473.

[5] 40 Am Jur 2d, Homicide § 535.

[6] 58 Am Jur 2d, New Trial §§ 212, 213.

[7] 58 Am Jur 2d, New Trial § 166.

[8–10] 58 Am Jur 2d, New Trial § 175.

Recantation by prosecuting witness in sex crime as ground for new
trial. 51 ALR3d 907.

to the presence of the defendant at the scene of the crime then the defendant should be acquitted applies only to the defense of alibi and is not required where a defendant did not raise the alibi defense, and where a defense of alibi would not apply because his presence at the scene of the crime was not necessary for the commission of any of the crimes with which he was charged or convicted.

4. WITNESSES—CRIMINAL LAW—APPEAL AND ERROR—TESTIMONY— FAILURE TO RECOLLECT—PRELIMINARY EXAMINATION—USE OF EXAMINATION TRANSCRIPT—HEARSAY—FAILURE TO OBJECT—REQUEST TO STRIKE.

The inability of a witness to recollect matters testified to in preliminary examination and the utilization of the examination transcript to correct the witness does not result in reversible error under applicable hearsay exception rules where there was no objection and no request to strike the testimony; failure to object and failure to request striking of the testimony precludes appellate review.

5. HOMICIDE—MURDER—SECOND-DEGREE MURDER—LESSER INCLUDED OFFENSES—INSTRUCTIONS TO JURY.

A trial court was not required to instruct a jury on the lesser included offense of second-degree murder in a murder trial, without a request for such instructions, prior to January 1, 1976.

6. NEW TRIAL—DISCRETION—ABUSE OF DISCRETION—APPEAL AND ERROR.

The decision on a motion for a new trial is within the sound discretion of the trial court and the denial of such a motion will not be overturned on appeal absent a showing of clear abuse of that discretion.

7. NEW TRIAL—EVIDENCE—NEWLY DISCOVERED EVIDENCE.

Newly discovered evidence in order to form the basis for a grant of a new trial: (1) must in fact be newly discovered, (2) must not be merely cumulative, (3) must be such as to render a different result probable on retrial, and (4) must be such that a defendant could not with reasonable diligence have produced it at trial.

8. NEW TRIAL—EVIDENCE—NEWLY DISCOVERED EVIDENCE—RECANTING WITNESSES—DISCRETION—APPEAL AND ERROR.

The Court of Appeals is reluctant to find an abuse of trial court

discretion in denying a motion for a new trial on the grounds of newly discovered evidence where the newly discovered evidence is a recanting affidavit of a trial witness.

9. CRIMINAL LAW—EVIDENCE—NEWLY DISCOVERED EVIDENCE—RE-CANTING WITNESSES—RETRIAL—DIFFERENT RESULT.

Newly discovered evidence in the form of a recanting affidavit of a trial witness will not support the reversal of a defendant's conviction where the new evidence would not render a different result probable on retrial.

10. NEW TRIAL—EVIDENCE—WITNESSES—NEWLY DISCOVERED EVI-DENCE—RECANTING WITNESSES—APPEAL AND ERROR.

The matter of granting a new trial on the basis of a recanting affidavit of a witness and a claim of newly discovered evidence is not properly before the Court of Appeals where the defendant does not explain how he came into possession of the affidavit, made no motion for a remand to the trial court for an evidentiary hearing, and apparently has made no motion in the trial court for a new trial based on the affidavit.

Appeal from Recorder's Court of Detroit, Robert J. Colombo, J. Submitted May 5, 1977, at Detroit. (Docket Nos. 24543, 25370.) Decided August 8, 1977.

Louis Williams and Manuel Scotts were convicted of first-degree murder and conspiracy to commit murder. Defendants appeal. Affirmed.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *William L. Cahalan,* Prosecuting Attorney, *Edward R. Wilson,* Research, Training and Appeals, and *Andrea L. Solak,* Assistant Prosecuting Attorney, for the people.

*Timothy F. Neenan,* for defendant Scotts.

*Louis E. Williams, in propria persona.*

Before: T. M. BURNS, P. J., and BRONSON and C. W. SIMON, JR.,* JJ.

T. M. BURNS, P. J. On March 14, 1975, Louis Williams and Manuel Scotts were jury convicted of first-degree murder[1] and conspiracy to commit murder[2] in the killing of Phyllis Jones, and first-degree murder in the killing of Janice Hull. Defendants' appeals as of right are consolidated for disposition.

Defendant Williams owned two party stores in Detroit (identified herein as Stores #1 and #2). Defendant Scotts was the manager of Store #2. In the early morning hours of May 31, 1973, the bodies of Phyllis Jones and Janice Hull were found in the rear of Store #2. The women were bound and gagged and their throats had been cut.

The theory of the prosecution as to the murders was as follows. Williams and Scotts planned to kill Phyllis Jones to recover the proceeds of an insurance policy on her life. A man named James Sparks was approached by the defendants to do the killing. Sparks refused because he would not be paid until the insurance proceeds were collected. In the early part of May 1973, defendant Scotts offered a man named James Hendricks money if he would kill Miss Jones. Hendricks agreed and several meetings between Hendricks, Williams and Scotts were held to plan or discuss the murder. It was decided that Miss Jones, an employee at Williams' Store #2, would be killed while on duty to make it appear that she was killed during a robbery. It was understood that any co-workers present at the time would also be

---

* Circuit judge, sitting on the Court of Appeals by assignment.

[1] MCLA 750.316; MSA 28.548.

[2] MCLA 750.157a, 750.316; MSA 28.354(1), 28.548.

killed so no witnesses survived. Janice Hull was employed by Williams and worked with Miss Jones on the night she was murdered. After the murders were committed, Williams and Scotts applied for and received the proceeds of the $100,000 insurance policy on Miss Jones' life.

A prosecution witness named Margaret Ann Gibbs testified that she had been employed as a cashier at Store #2. The murder victims, Phyllis Jones and Janice Hull, were also employed at the store. On a Friday late in May 1973, defendant Scotts told Gibbs that he received a telegram from his wife in California that one of his children was sick and that he would have to go there right away. Miss Gibbs was left in charge of the store. That Sunday (the day of the murders), while she was working at Store #2, Gibbs received a telephone call from defendant Williams. He asked her to work for him at Store #1 because he was short of help. Gibbs told Williams to check with Scotts to see if it was okay. That afternoon Scotts called Gibbs and told her she could work at Store #1. She was to report there at 6 p.m. and stay there until 9 p.m. when she would return to Store #2 to help Phyllis Jones prepare for receipt of a wine shipment due the next day. When Gibbs left Store #2 at 6 p.m., the following persons were present: Janice Hull, Phyllis Jones, James Hendricks, his wife Doris Hendricks, their son Jimmy Hendricks, and a person known only as Clifford. Jones and Hull asked Gibbs to telephone before returning to Store #2 that evening so that they could arrange for her to bring back something to eat.

At about 9 p.m. that evening, Gibbs called Store #2 but got no answer. She called again at around 10 p.m., again receiving no answer, even though the store was supposed to remain open until 2 a.m.

Gibbs asked Williams to go check the store. Upon his return he stated that the store was locked and no one was there. Further attempts to reach someone at Store #2 by Gibbs were unsuccessful. Around midnight, Gibbs again asked Williams to check the store. Upon his return, Williams reported that the store was still closed and the front door was padlocked.

At 2 a.m., Williams, Gibbs and a stockboy went to Store #2. When they arrived, there was no padlock on the door. The stockboy looked through a window at the rear of the store and observed bodies on the floor. The police were summoned and gained entry through an unlocked back door.

Gibbs further testified that she remained at Store #1 until around 7 a.m. and was told by Williams not to mention to the police that Hendricks had been at the store that night.

James Hendricks gave the following testimony[3]. In May 1973, he was released from Marquette prison. He told defendant Scotts that he was broke. Scotts, in response, offered him a contract for a killing. Hendricks said he would do it. Scotts expressed his agreement, but said that Williams would have to approve. A few days later, Hendricks and Scotts met again. Scotts conveyed Williams' approval. Scotts explained that the contract involved the killing of a girl for the proceeds of an insurance policy as soon as she changed the beneficiary's name from her father to Scotts'. Hendricks was to receive an automobile, some cash when the murder was committed and the balance upon collection from the insurer. In subsequent meetings, Scotts and Hendricks planned the details of the

[3] In exchange for his testimony, Hendricks was permitted to plead guilty to second-degree murder in charges arising out of the murders of the two women. Hendricks' wife and son were granted immunity from prosecution.

murder. The victim was Phyllis Jones; the scene of the killing was to be the store, and it would be made to appear as if a robbery had taken place. If any of the other women were present at the time, they were to be killed also.

Hendricks began working at the store as a security guard. The killing was to be done on a weekend when there would be considerable money in the store, thus supporting the robbery angle. The money taken in the "robbery" would be divided equally between Scotts and Hendricks. At one of the meetings Scotts informed Hendricks that he did not want Gibbs killed because he liked her. She would be taken out of the store the day of the "robbery". Hendricks also testified to having conversations with defendant Williams concerning when and where the killing would take place.

On the evening of Sunday, May 20, the "robbery" occurred. While his wife and son took money and other goods from the store, Hendricks killed the two store clerks by cutting their throats. Hendricks then drove to meet Williams, who paid Hendricks $100. The following week Hendricks met Scotts, who paid him $600.

Hendricks was arrested in connection with these killings in the summer of 1974. Hendricks made statements to the police implicating Scotts and Williams in the murders. Later, while in prison, Hendricks signed written statements exonerating Williams and Scotts.

Doris Hendricks testified that she overheard discussions between Scotts and her husband in which Scotts offered a contract for killing two women. She overheard similar conversations between her husband and Williams.

Edward Dorsey testified that he sold insurance for a company named I. D. S. during the spring of

1973. He discussed with Scotts and Phyllis Jones a partnership agreement and key man insurance. Miss Jones did purchase a life insurance policy with a face value of $100,000. When the policy was issued, Miss Jones' father was named as the primary beneficiary. Subsequently, the policy was changed to show Scotts as the primary beneficiary. A few days after Miss Jones' death, Scotts asked Dorsey to start a claim on the policy.

James Peterson testified that he was a claims manager for I. D. S. Life Insurance Company. He stated that Scotts and Williams twice visited the company offices in Minneapolis in September, 1973, to collect the proceeds of the insurance policy on Miss Jones' life. Williams advised the insurance company that he was Scotts' attorney and that he had a claim to a portion of the proceeds of the policy. Mr. Peterson delivered to Scotts a check in an amount exceeding $100,000 made payable to Scotts and Williams. It was stipulated at trial that Williams was not an attorney.

An acquaintance of both Scotts and Williams, James Sparks, testified that in February of 1973 Williams offered him $15,000 to kill "a young lady" at one of Williams' stores. Sparks was to be paid with insurance proceeds. Subsequent discussions of the planned killing included Scotts. Sparks rejected the offer because he would not be paid "up front".

The jury returned its verdict on March 14, 1975. On March 21, 1975, both defendants were sentenced to three life sentences each.

On March 1, 1976, defendant Scotts filed a motion for a new trial on the basis of newly discovered evidence. Attached to this motion (and constituting the basis thereof) was an affidavit of Margaret Ann Gibbs. Basically, Miss Gibbs asserted that

the testimony she gave at trial was almost entirely false and that she had been forced by the police to testify against the defendants. The affidavit was dated November 28, 1975, and notarized in Oklahoma. Accompanying the motion for a new trial was a motion to subpoena the witness and return her to Michigan. Both motions were denied on April 21, 1976. Between them the defendants raise nine issues on appeal.

## I

Defendant Williams first argues that the trial court erred in allowing the prosecutor to make constant reference in his examination of James Sparks to the extention of Sparks' immunity to crimes in which Williams was involved.

There was much confusion over and discussion of the extent of the grant of immunity to Sparks. This discussion, some of which was heard by the jury, included a reference to "immunity for anything having to do with Williams". At another point, during examination of Sparks on his understanding of the grant of immunity, the following colloquy occurred:

Q [by the prosecutor] "Well, let me ask you this, do you have any recollection of my ever conveying to you that I was going to get you immunity on Deacon Jones?"

A [by Sparks] "Your terminology was that you would get me immunity for the several matters that Louis Williams had on his examination and Deacon Jones was one of those matters."

Defense counsel raised no objection to the inquiry on the record, but after a conference at the bench the trial judge cautioned the jury that they

were not to consider the crimes for which immunity was given as involving defendant Williams.

We do not interpret this episode as constant reference by the prosecutor to crimes in which Williams was involved. Examination of the transcript reveals no deliberate and repeated efforts on the part of a prosecutor to present the jury with facts concerning prior criminal activities of a defendant. Furthermore, we can find no prejudice to the defendant flowing from the oblique references to other criminal activities in the context of the questioning involved here.

## II

Defendant Williams next argues that the trial court erred in forcing the prosecutor to give Sparks blanket immunity. It is suggested that a witness will testify as to *anything* in exchange for immunity on six homicides and an unspecified number of arsons.

There was no error of which defendant may complain, as defense counsel fought strenuously and successfully for the blanket immunity. See *People v Embry,* 68 Mich App 667, 670; 243 NW2d 711 (1976). The jury was acutely aware of the scope of the immunity and was able to consider its effect on the witness' credibility.

## III

Defendant Williams contends that the trial court erred in permitting the admission into evidence of proof of prior criminal acts on the part of Williams to prove that he committed the charged offenses.

The allegedly prejudicial testimony cited by defendant includes no references to other offenses

involving the defendant. Reference was made to the grant of immunity to Sparks for "anything that involved Louis Williams", obviously referring to the murder charge in the case at bar. The argument has no factual basis.

## IV

Defendant Williams urges reversal of his conviction for failure of the trial court to instruct the jury that if any reasonable doubt exists as to the presence of the defendant at the scene of the crime, then the defendant should be acquitted. See *People v Erb,* 48 Mich App 622, 630; 211 NW2d 51 (1973). The cited instructional requirement applies to instruction on the defense of alibi.

Defendant Williams did not raise an alibi defense. He did not raise an alibi defense because presence at the scene of the crime was not necessary for commission of any of the crimes with which he was charged and of which he was convicted.[4]

## V

Defendant Williams' final argument, that the trial court erred in the manner in which it received the verdict of the jury, does not merit discussion.[5]

---

[4] Nor was presence of the defendant at the scene of the crime alleged by the prosecutor.

[5] "THE CLERK: Mr. Foreman, how do you find the Defendant Louis E. Williams as to Count One, Conspiracy to Commit Murder in the First Degree as to Phyllis Jones?

"THE FOREMAN: Guilty.

"THE CLERK: How do you find the Defendant Louis E. Williams as to Count Two, Murder in the First Degree as to Phyllis Jones?

"THE FOREMAN: Guilty.

"THE CLERK: How do you find the Defendant Louis E. Williams as to Count Three, Murder in the First Degree as to Janice Hull?

"THE FOREMAN: Guilty.

## VI

Defendant Scotts asserts in his brief on appeal that the trial court erred in not striking the testimony of James Sparks.

Sparks' testimony concerned, for the most part, Williams' offer of a contract to kill someone in his store. During direct examination by the prosecutor, Sparks was evasive in his answers. The prosecutor used portions of the preliminary examination transcript in attempts to clarify or point out contradictions in Sparks' testimony.

Defendant Scotts argues that the witness evinced no recollection of the matters to which he testified and that the prior testimony was not properly admitted under the applicable hearsay exception rules.

Although apparently possessing a good memory at the preliminary examination, Sparks' memory when testifying at trial was very faulty. The prosecutor found it necessary to utilize the transcript of the preliminary examination to correct the witness. Sparks' value as a witness was greatly diminished by it. This may have been the reason why defense counsel did not object to the procedure followed. In any event, failure to object and failure to request striking of the testimony precludes review. *People v Pulley,* 66 Mich App 321; 239 NW2d 366 (1976). It should be noted that the trial court *sua sponte* cautioned the jury on the limited use to which the prior testimony could be used. We find no manifest error.

---

"THE COURT: All right, Mr. Nunn, you mean by that that you find him guilty of Conspiracy to Commit Murder in the First Degree as to Phyllis Jones in Count One; guilty of Murder in the First Degree as to Phyllis Jones on Count Two; guilty of Murder in the First Degree as to Janice Hull on Count Three?

"THE FOREMAN: Yes.

"THE COURT: Thank you."

## VII

Defendant Scotts also argues that the trial court erred in not instructing the jury on the lesser included offense of second-degree murder.

Such instruction was not requested. This trial having taken place prior to January 1, 1976, there was no error. *People v Jenkins,* 395 Mich 440, 443; 236 NW2d 503 (1975).

## VIII

The final issue on appeal—raised by defendant Scotts—is whether the trial court erred in refusing to grant defendants' motion for a new trial on the basis of newly discovered evidence.

The newly discovered evidence constituted those matters referred to in the recanting affidavit of Margaret Ann Gibbs. In an affidavit dated November 28, 1975, Miss Gibbs stated that the testimony she gave at the trial of defendant Scotts was false. She stated that the testimony she gave was given to her by the Detroit Police Department and that the police threatened to charge her with the murder if she didn't do as they told her.

Decision of a motion for a new trial is within the sound discretion of the trial court. *People v Bersine,* 48 Mich App 295; 210 NW2d 501 (1973). Denial of such a motion will not be overturned on appeal absent a showing of clear abuse of that discretion. *People v Pulley, supra.*

In order to form the basis for a grant of a new trial, newly discovered evidence (1) must in fact be newly discovered, (2) must not be merely cumulative, (3) must be such as to render a different result probable on retrial, and (4) must be such that defendant could not with reasonable diligence have produced it at trial. *People v Keiswetter,* 7 Mich App 334, 343-44; 151 NW2d 829 (1967).

Where the newly discovered evidence is a recanting affidavit of a trial witness, this court will be reluctant to find an abuse of discretion in denying a motion for a new trial. *People v Pulley, supra, People v Harris,* 31 Mich App 100; 187 NW2d 502 (1971).

Assuming *arguendo* that the other requirements are met, the newly discovered evidence simply is not such as would render a different result probable on retrial. The trial testimony of the recanting witness had little or nothing to do with defendant Scotts' participation in the crimes. Other evidence demonstrated Scotts' involvement in the murders. While Miss Gibbs' trial testimony was damaging to defendant Williams, without such testimony the evidence against him would remain strong. This is far from being a case in which the sole complaining witness recants his testimony. See, *e.g., People v Blair,* 44 Mich App 469; 205 NW2d 183 (1973).

## IX

In a brief in reply to the prosecutor's brief on appeal, defendant Scotts urges that a new trial be granted on the basis of other newly discovered evidence, namely a recanting affidavit of James Hendricks. Attached to defendant Scotts' reply brief is a document entitled "THIS IS A TRUE STATEMENT OF FACTS". It is purportedly signed by James B. Hendricks, Sr., dated October 15, 1976, and is notarized. In this document, Hendricks asserts that his trial testimony against defendant Scotts was false and that it was coerced by the police under threat of harm to Hendricks' wife and son.

Defendant Scotts does not explain to this court how he came into possession of this document. Defendant makes no motion for a remand for an

evidentiary hearing. He apparently has made no motion in the trial court for a new trial based on the affidavit.

While the matter is not properly before the court, some observations for possible future reference are warranted. We are faced here with the recanting affidavit of a man who had admitted murdering two women. When arrested in connection with the murders he gave a statement to the police. Later, while in prison, he denied the truth of his previous statement. Called to testify under oath in the trial of this case he again admitted his and the defendants' participation in the murders. Many months later, again languishing in prison, he makes another denial. We are not impressed.

Affirmed.